My name is Darlene Jacobs and I will be representing the appellant and I will be covering two issues in my oral argument. The first is whether or not the alleged market issue is not used in commerce and therefore not protected under the Lantham Act because the Coalition does not raise funds, we don't solicit funds, we don't obtain funds from any candidates offered from the general public in general. The second argument that I will be addressing is whether or not Judge Barbier should have granted summary judgment to the plaintiff when genuine issues in fact exist. The Lantham Act does not apply, we believe, Your Honors, because the trademark of the Coalition is not used in commerce or for the sale of goods or services. It is only used in the context of endorsing candidates for political office. Yes, sir. Thank you. I did not mean to interrupt you, but I was preparing to ask you a question. Can you point out to me where in the Lantham Act these terms are defined such as commerce, these sorts of things? Are they defined terms in the Lantham Act? They're not. Really, they are defined in case law, which we found and which I'm prepared to argue. One of the case laws that might be applicable to a political organization is United We Stand, which is from the Second Circuit. In that particular case, a decision was rendered involving two political organizations where the issue of commercial activity was at issue. As this Court is aware, congressional authority warning regulation under the Lantham Act comes from its authority to regulate under the Commerce Act. And in the United We Stand, the Court found actual commercial activity where the parties were organized to solicit and raise funds for a campaign. In this particular case, they were raising funds for Ross Perot. Okay, and what did the Second Circuit hold in that case? Were those marks covered? There was political activity because they were using their political organization to raise funds for a candidate. We don't do that. And so, okay, so you're saying the distinction between the Second Circuit case is your organization doesn't raise funds. There's other distinctions, too. We have a copy of our ballot, and as you'll see from our ballot, we existed since 1982 in the timeline. In our particular ballot, we have the people that we endorse, and then underneath we have a message to the voters. If you're alarmed over the courts putting murderers, armed robberies, and rapists back on the streets, and you're concerned, et cetera, that's our message mainly to the New Orleans organization because crime is so horrible in this city. It has been since 1982. This is the same message that we've used since 1982. And how do you fund these flyers? Well, they're funded through another organization, which is not a political organization, which they give us. It's not a flyer. We don't put out flyers. We just do a political ad. Aren't these put on doors? Sir? You don't mail these on doors? At one time, 10 years ago, we did a door hanger, but we don't do that anymore. To me, that's a flyer. Well, that was like 10 years ago. We don't have the money to do it. The ad runs around. Counsel, I'm sorry. If I could get my question out. Whatever this thing is, it costs something to print. How is that paid for? Because you say you don't raise money. It's paid for by another corporation. That's not a political organization. Okay. And it's the same. We only do one ad because that's all we can afford with the same message. And on the front of it, it says, paid for by the Coalition for Better Government. And what we have is a hawk. I don't know if you can see that, a hawk. The alliance has an eagle, and the alliance's eagle doesn't look like the eagles that you have up there, for instance, up above Uranus. That, to me, determines an eagle, what an eagle looks like. They have their eagle looking somewhat like a hawk. When we went to trial in this case, and summary judgment was granted, the court never gave us a chance to prove that the alliance's mark was not distinctive. It clearly isn't, because a hawk and an eagle are birds of prey. They pretty much all look alike. Why do we have a hawk? Because a hawk watches, and we want people in New Orleans to know that somebody's watching over the city. Okay, and you're saying this ROA 335, this document, was an ad somewhere? It's an ad that appeared in the Times-Picayune, yes, ma'am. It's in the record. So somebody's supposed to cut this out of the paper and take it with them in the polls? If they want to. It says the law permits you to take this ballot into the polls. Yes, ma'am. But you're not handing it out at the polls? No. Okay. No, we don't. We don't do any active campaigning door-to-door or anything like that. We don't have the money to do that. The alliance, on the other hand, charges clients, rather, charges the people that they endorse. They have to put up a large amount of money just to get the endorsement. We accept no money from any candidates. We just don't. We're just a good government group. That's all we do. Is it your position that, as a matter of law, the Lanham Act does not apply to nonprofit organizations? That is my position. There is no nonprofit organization. United Way. Somebody can take out a logo of the United Way and mimic it and make it almost exactly the same, such that people might be confused, and put it out there, and the Lanham Act simply doesn't apply because it's a nonprofit. Is that your argument? I'm saying if it's a nonprofit that doesn't solicit funds from the public and doesn't actually go out to do things like that, we say that it doesn't apply. In the United We Stand case out of the Second Circuit, there was commercial activity. They were raising money for Ross Perot, and we don't do that. We did do some shepherdizing. I'm not a trademark lawyer. I have to tell Your Honor that I'm not, and I'm doing the best I can with this. The Fifth Circuit only cited United We Stand once, and it distinguished it in the TMI Incorporated v. Maxwell case. In that case, the court reversed the district court in favor of the so-called infringer, if you look at that case, because they said that the so-called infringer had no business purpose, just as the coalition doesn't have a business purpose. So I'm reading from United We Stand, the Second Circuit. I'm reading from page 90 of the opinion, and it says, quote, a political organization that adopts a platform and endorses candidates under a trade name performs a valuable service of communicating to voters that it is determined that the election of those candidates would be beneficial. Now, that sounds like the mission of your organization or the organization that you represent. Is it not? That's all we do is those candidates. That's all you do. That's it. Okay, and yet the Second Circuit found that the Lanham Act did apply, but you're saying that— Well, because in that particular case, there was commercial activity. They were going out soliciting donations from people. It was formulated to solicit money in order to promote the organization. We don't do that. How could commercial activity encompass buying ads in the paper? That's commercial activity. You're paying the Times-Picayune or whoever to run your ad. I couldn't find any case that said that, Jones. Well, I mean the definition, as I have here at 15 U.S.C. 1127, the Lanham Act defines commerce as, quote, all commerce which may lawfully be regulated by Congress. Now, I haven't gone back and read the Commerce Clause precedents, but as memory serves, they're awfully broad, and they don't necessarily—I mean controversially so. They're one of the broadest clauses of the Constitution to have been interpreted by the Supreme Court. And, I mean, as I recall, they don't require sort of the exchange of money necessarily. They require more of a— I guess the issue is whether or not free speech is covered under the Lanham Act. Okay, well, I was going to ask you about that because it wasn't clear to me if you were making a stand-alone free speech. What is your free speech argument with respect to the Lanham Act? Free speech is our message. This is our message. If you're concerned over the courts putting murderers and armed robbers and rapists back in the streets— Well, no, I understand that's your message, but we're not talking about your message. We're talking about this. Okay. Right? We're talking about this, and I'm referring to the logo. Oh. So— What is the message on the logo? No, I'm saying what's your—is your argument that because you're a political organization, and you're obviously engaging political speech and nobody's trying to keep you from doing that, but we're talking about whether the logo, the coalition logo, violates the Lanham Act because it's so confusingly similar to the alliance. Because, well, the trial judge—we didn't have a trial on that. Well, no, we're not talking about the summary judgment. I'm talking about your First Amendment claim. I'm trying to understand if you're saying the First Amendment somehow exempts your organization from the Lanham Act because of the nature of your organization. The Lanham Act only applies where it's likely to cause confusion or to cause a mistake or deceit. Yeah, but that's jumping ahead to the summary judgment. I'm talking about—you said it's free speech, and I agree that you have the right to free speech, but the Lanham Act still applies, right, to your logo, to your mark. Don't you agree with that or not? The Lanham Act would apply to the mark if, in fact, we were mimicking somebody else. And we say we're not. They're all very— That's a separate issue. Earlier you were saying it can't apply. Now you're saying they didn't meet their burden. I mean, if you did the exact same ad but you called yourself Citizens for a Better Government and had a koala bear as your animal, they may not come. I mean, it's not the rest of it. It isn't this vote for Judge Paula Brown part that they're upset with. It's the logo. And they're saying that the confusion here is there might be people who think the Alliance for a Better Government is, in fact, an entity they care about. They care about their endorsement. And so if they see this, they think that's what that is, and so they go vote for Paula Brown thinking the alliance told them to do it, and it turns out it wasn't the alliance. It was the coalition. And vice versa. Maybe people respect the coalition, really want to do what the coalition directs, and then they see an alliance ad and think that's the point of confusion, that people follow these voters, not necessarily, but they might be influenced by these. That's the whole reason you do it is you're trying to influence voters to vote the way you think they should. I don't want to influence them on our font, which is the hawk. I mean, they have to show confusion. They haven't shown it. No, but that's the thing that gets people's attention. It's like if you see at Golden Arches, do you think of anything other than McDonald's? Do you think it's Katharina's Burgers? No, you think it's McDonald's. That's why the Golden Arches are kind of a symbol. It has to be distinctive. We have an expert that we hired to testify at the trial. If we would have gotten there, but the judge never allowed us to get to the trial. He just said this is it. I'm going to make up my mind on this. Without allowing us. Did he allow you to oppose the summary judgment motion? Yes, and we did oppose it. We did oppose it. And by putting in whatever countervailing evidence that you thought created a fact issue. Well, we did. Okay, now can you point to me in the record evidence that creates a genuine issue of material fact on confusion? Okay. In other words, the judge, I'm sorry, but the judge, Judge Barbier found there's no genuine issue of fact on likelihood of confusion because of all of the different indicia. So point to me evidence in the summary judgment record that says no, he was wrong. There's a genuine fact issue on likelihood of confusion. Well, the court himself said on page 29 of the trial transcript, no evidence of confusion. This is the judge himself saying this, and the defendants agreed. If you look at page 29. You mean actual confusion? No evidence of actual confusion. No evidence of somebody coming in and going, I voted for the coalition guy because I thought it was an alliance guy. That's what that's saying. Right, but there's no evidence of that. Right, but that's not the only indicia that we look to to see likelihood of confusion, right? We have others. Well, there are others, but we think that that's a jury issue for the jury to decide after hearing all of the evidence, and we're not allowed to do that. And that's why we hired an expert. Is your expert report in the summary judgment record? No, because expert reports were not due at that time. We had hired an expert. Do you want me to go into the summary judgment next since I have the, should summary judgment have been granted? We have several issues as to why it should not have been granted. Number one, there was no evidence of the likelihood of confusion according to the trial judge himself and according to the defendant. They did not support the record by affidavits, exhibits, or depositions showing that there was any likelihood of confusion. Well, I think reading the district judge's comments, it seems to me that what influenced him the most was the similarity between the two marks. But he also said the coalition for better government is the same thing as alliance for good government. And if you look at Webster's dictionary, they mean different things. A coalition is a group of individuals who band together, and an alliance is a group of organizations. So it is different. So he knocked out our name and our font. And the other issue, excuse me, in addition to the likelihood of confusion, he didn't. I mean, is it your position that the jury ought to be able to decide whether there's a likelihood of confusion between the hawk and the eagle? Yes, sir. As you've placed it in your. Yes, sir. You want to give that to the jury? Okay, and the other thing that we want to. It's your position that you have a hawk. We have a hawk. You have a hawk. We've always had a hawk. An alliance is an eagle. They say they have an eagle. They say they have an eagle. Yes. The issue to be decided here also is was there an intent to infringe, and there was no intent to infringe according to the judge in the trial transcript. We've been using this mark since 1982. Okay. And you have reserved time for rebuttal. Okay, yeah. Okay. Thank you. Thank you, Your Honor. Thank you, Your Honor. Mr. Sahuk. Richard Sahuk. On behalf of the alliance, I prepared a page with both marks on it, but it seems like you've all seen both of the marks. I think if you want to show us one more time, you don't need to. We have seen it over and over again. Okay. Then we're good. Okay. But that doesn't help us with the original question of whether we even have jurisdiction under the Lanham Act. Correct. It could be the same mark, and it wouldn't matter if we don't. That is correct. Yeah. However, trademark laws and the Lanham Act exist not to protect trademarks but to protect the consuming public. So the act's purpose of reducing consumer confusion supports application of the act of political speech where the consequences of widespread confusion as to the source of the speech could be dire, and that is what the United We Stand case talks about. Well, I get that, but before we rush ahead to the purposes of the Lanham Act, is there an in-commerce requirement in the Lanham Act? There is, and I think, Your Honor, you mentioned it during the appellant's argument. They're talking about the Commerce Clause, and it's incredibly broad. So if you could respond to the argument that your friend on the other side is arguing, that because coalition doesn't solicit funds, therefore its mark is not in commerce within the meaning of the Lanham Act. If you could respond to that specific argument. Well, first of all, as far as the implication of the Commerce Clause, an act just needs to be able to affect commerce in some way, and it's very broad in that manner. There are ads purchased, that's commerce. Certainly the elected officials affect commerce in their decisions. But if they're purely local elected officials, and I see one of them was President Bush, so that's not local, but the rest of them seem to be local judges in a local paper, how does that affect interstate commerce? Because not just commerce, it's interstate commerce. They're actually senators as well. Okay. So you're saying because the politicians that they endorse are themselves federal officials, that that is sufficient? That's part of it. So if they limited it to local judges, would that change the outcome? If they only endorsed local judges, like Paula Brown? I think local judges can affect interstate commerce as well. They can, certainly, but, I mean, it's a local election. Does the U.S. government get involved in doing regulations for local elections? Not in my experience. That's a state matter. The federal government has legislated guns near schools. Yeah, and not real successfully on some of that. Well, some of it has been upheld. Yeah, some of it hasn't because it was too local. And so it seems to me a local judge making state court type decisions, I'm not aware of a case that says that's interstate commerce. But we're not limited to that here, Your Honor. Well, that's what I was getting at. If you could point us, something tells me we're not riding on a blank slate here. Maybe in this circuit, this is a novel question, but could you point me to some cases that have tried to flesh out, you know, is there a commerce hook that a landmark, that a mark has to have? And what's the test? I've read you the definition of commerce from the Lanham Act. First of all, the Lanham Act has been used to apply to nonprofit organizations that aren't engaged in seeking profit as a motive. What's your best case for that proposition? Nonprofit, because that's different from what Judge Haynes was talking about. He was talking about the localism aspect. Well, there's the United States JCs versus Philadelphia JCs. It involves public service projects, including the Special Olympics. There's the United States JCs versus San Francisco Junior Jammer of Commerce. It involved meetings and competitions and other special events for young men interested in community affairs and community betterment programs. And that's local. But she, your opponent says the distinguishing feature really, she didn't really focus on local versus not local commerce. That was my question. But she focused on fundraising versus not fundraising. She said all of those cases involve fundraising. I know the JCs does fundraising, and certainly a lot of nonprofits do fundraising, even though the fundraising is for the purpose of nonprofit, and her group does not. So she said that takes her out, her group out of the calculus. That's incorrect based on the record. The record does show that the coalition has purchased advertisement space and has spent money. But spending money is different from raising money. Well, I could just buy an ad that says everybody support your local X, we'll just say X charity. Okay, support X charity. And I just buy that ad myself as the Coalition for Greatness, and I haven't raised any money at all. I just paid for it. And that's what she's saying. She's saying they have some sort of sugar corporation that supports them, and that is how they pay for it, and they don't go out and say, hey, contribute to the coalition for better government so that we can buy ads. And that's why they don't have enough money to buy flyers or whatever they don't do. Then you could have a situation where a wealthy individual bought a bunch of ads saying that they are the Republican Party or the Democratic Party endorsing a candidate or a political action. But then that would be state court fraud. I mean the question isn't whether there's some cause of action that could prevent somebody from pretending to be something they're not. That's different from whether there's a Lanham Act violation. But then we get back to the purpose of the Lanham Act, and that's to avoid confusion among the public as to source identification. And while some of that is to protect consumers from wrongfully spending money or wasting money on things that they don't want or think that comes from one source when it really comes from another and is maybe inferior, it seems it's all the more important when it comes to voters being confused about who to vote for because people these days rely upon endorsements to vet certain candidates. A lot of the public doesn't. So I think the Lanham Act is very important and plays a very important role in that respect. We're talking about commerce. What spending would an organization like this do? I mean I would think they'd be buying paper. Do they print these up at a commercial printer? Do they pay people to distribute them?  Well, all three of those, Your Honor. There's printing costs, or I guess if you buy ad space, then the ad, I mean they print, but you have to provide a copy to them to print up. But you're still purchasing ad space in the newspaper or on radio. They say because they don't do fundraising, they're down to the one ad in the paper, and that's all they do. It's still money. It's still purchasing. It's still commerce. So that's good enough. Buying one ad in the paper is good enough to satisfy the commerce tag, and now we're just dealing with are these actually confusing and is it a hawk or an eagle or whatever. Yes. Do they have radio ads or TV ads? I'm not aware of the coalition having radio or television ads. I do believe, though, that if a candidate wanted to run an ad and place the logo on it, that that would probably be allowed. I'm not absolutely certain of that. So you're saying that once they – I've just been using Paula Brown as an example because she's the first person here on this 2017 coalition document. If she wanted to run an ad that says endorsed by the Coalition for Better Government, you're saying you think she could do that and use the logo properly. I know the alliance does allow that. Okay. What about is it really confusing? I know you've shown us a million times so we can look at it. Anything else you want us to look at in that regard as to whether it's confusing, that better and good are similar concepts, whatever? She says coalition and alliance mean different things. I don't know if the ordinary pop dog vendor thinks so or not. I actually found a definition, I believe it was in the Oxford Dictionary, and it was probably cited in my brief, that one of the words did appear in the definition of the other word. So I guess it depends on which dictionary you're looking at. But I think any thesaurus you would look at would show that they're similar. Bottom line, what would satisfy your client for them to do? I mean, clearly they're allowed to do this endorsing. They're clearly allowed to buy an ad. They're clearly allowed to say this judge is better than that judge or this presidential candidate, whatever. What is it that they need to do differently? How do they need to change their logo? Well, they would need a different name, and they should choose a different design that isn't an absolute perfect copy replica. That stylized bird, I think what you're looking at right there is an older version of the coalition. So they can't use good or better, they can't use government, and they can't use anything that implies a group, and yet they're supposed to be endorsing candidates? Your Honor, that's not what I said. Okay. They can use government. They could use good or better. They could use maybe. So how about people for a better government with a koala bear? That would be okay? That might raise a jury question. That might raise a jury question, but I don't think we have a jury question here the way it is used. Using those words in that order is almost exactly like. But the problem to me about that argument, I understand about the hawk and the eagle and the look of the logo, but to me the wording, I mean, better government, good government, best government, those are exactly what you're talking about when you are endorsing candidates, I hope. Few people want to run the coalition for a terrible government, unless that's a sarcastic thing. So the fact is that for us to say you're prohibited from using those words seems a little bit extreme. It does seem to be impinging on their First Amendment rights. It's those words in that order, Your Honor. And, in fact, while Ms. Jacobs was speaking. Well, you usually put an adjective before a noun. While Ms. Jacobs was speaking, Your Honor, you even said. No, I know that. Better government. I know that I said that, and I thought you were going to make a point of that. But either way, whether it's good or better, the better government, good government, I don't understand how that, how you can prevent somebody. Those are normal terms. That's exactly what people talk about. When I was a candidate for state court judge, I spoke about good government. I mean, what. It's in the order. If it was better government for the people, that sounds a lot different. But alliance for good government and coalition for better government, even the cadence is the same. When, do you, or can you tell me as a matter of trademark law, when a court is looking at two marks, does the court look at the marks in their totality? Or is it looking at each individual word and making a judgment about each word? Which is it? It's in the totality. So you're not asking this court to rule that the coalition can no longer use the word government. You're not asking us to do that. You're asking us to affirm that there's no genuine issue of material fact on likelihood of confusion in two marks that I have here. This is the ones that I got out of the record. I mean, the bird looks the same. I mean, hawk, eagle, I don't know. It's a square. The text looks the same. The text is in the same, you know, I don't know. I'm not a print setter. I don't know what the proper word is. It looks awfully the same to me. So as a matter of analysis and trademark, what are the factors that a court is supposed to look to? Right. Well, the mark similarity is just one of them, and that's what we've been talking about. But there's also product similarity, which we've argued. Which ones are the ones that you would have argued or you did argue on summary judgment, really tip the scales? Right here, we hear that the marks are virtually identical. Okay. But the appearance of them. Yeah. I think even the words, even if you just put the words out together. But if they did the same logo but just called it People for Better Candidates, I think you'd be making the same exact argument because you just finished saying we can't prevent them from saying good government, better government. There are two trademarks. There's the composite mark, which is the words and the design, and then there's the word mark. Okay. And what are we talking about? We can't trademark good government. I don't think you can do that. That's too generic. I think you can trademark coalition for better government or alliance for good government, but I'm even getting confused here talking about it. Well, what are we talking about in this case? What is the content, if that's the proper term, of the mark? The two marks are that design that you just looked at. Yes. And then there's the word mark, which is alliance for good government. Are we talking about both here? Yes. The word mark. So Judge Haynes has a point there. Right? If we're talking about the words.  I mean if they come out with a communist flag and some other bird, a sparrow, and an arrangement of words that looks nothing like this, and yet it still says coalition for better government, is your position that it would be a violation of the mark? Not the composite mark. Probably not. But the words, I think, would still have an issue. Aren't you saying that the document they put out, looked at in totality, is confusingly similar to your mark? Yes. To your document? That is what I'm saying. And that I understand. The part that I'm having some trouble with is this notion that you get to trademark good government and no political organization of any kind, whether they fundraise or they're little or they're big, can use that. Your Honor, we trademarked alliance for good government. Okay, well they didn't say alliance for better government. They said coalition for better government. So two of the three words, the three key words, are different. And you're still challenging that. If they said people for better government, you would still challenge that. So you are trying to trademark the concept of a group that wants a good government. You're trying to trademark that concept, and I don't think you can. I think that's too generic. Did Judge Barbier decide? I mean, is that even before us? Did Judge Barbier decide that issue, the word mark issue? He did discuss about the coalition and alliance being synonyms, the better and good being just different degrees of the same adjective. And the fact that the words are in the same place in both marks. They appear in the same place, in the same order. So even when you're talking a word mark, of course it's not as striking as the actual design composite marks, but even the word marks are very similar when you're talking about the order, even the number of syllables, the cadence. I mean, it's just very similar. Let me ask you this. So we've got an election coming up, I hear, in November. They obviously want to endorse candidates. Is it your position that the order in this case prevents them from using the phrase coalition for better government in any context, no matter what it looks like? I believe that's what the injunction says. Okay. I think coalition has four syllables and alliance has three. Maybe I'm wrong. Yeah. Maybe in some southern pronunciation or something. A lot of guns. I don't know. But anyway, in typical cadence, you're saying the cadence is the same. I mean, better has two syllables, good has one. I don't know. I'm a little bit. Honestly, I think your point on the mark, the actual overall mark, is a good one. I think your point on the words is kind of taking it very far and very troubling to me because I think this is an area where we want people to be able to have their First Amendment rights, and the First Amendment rights include saying my team cares about good government and we think Judge X would be the better one for that. Your Honor, I can tell you that in oral argument on summary judgment, there had been a new mark that had just appeared in one of the ads, in an election that was happening right then and there, and it did not. It was coalition for better government. It didn't have an eagle. I didn't know where it came from. Judge Barbier, when I pointed out to Judge Barbier, he even brought it up in oral argument. Would you all be willing to even discuss the use of that mark? It was shut down by the other side. I think my client might have been willing to talk about that. What do you mean shut down? Well, you'll still have time to talk after this oral argument. Go ahead. No, no, that's fine. Okay. I'll re-read the transcript. All right. Thank you. Thank you. All right. Ms. Jacobs. Yes, ma'am. The Fifth Circuit does have a method where they try to get parties together. We said we would agree to it, and the Alliance for Good Government said they did not agree to it. No, we, as judges, try to stay out of that, so I don't mean to invest myself in that. I just want to tell you, what he's saying is not true. It's simply an observation that you all can always talk. Your Honor, the Lantham Act provides a cause of action for infringement when one uses any reproduction, counterfeit copy, colorable imitation of a mark without the registrant's consent, in commerce, in connection with the sale, offering for sale, distribution or advertising of any goods, where such is likely to cause confusion or to cause mistake or to deceive. So that last part of it, that's certainly a jury issue, and the judge says there was no confusion. They agreed there wasn't any confusion. People noted that. There was no actual confusion. That's one component. There are other components. Actual confusion is what Judge Haynes says, which is actual evidence that somebody came in and said I'm confused. That's why we ask for a jury in the case, Your Honor, to be able to plead our case. And what Judge Barbier did was he granted an injunction, not only on the mark but also on the name, and that prohibits us from bringing out our ballot and participating in the judicial elections that are coming up in November and endorsing candidates. Not only that, it's not before the court, but he also taxed the Coalition for Better Government with significant attorney's fees, which we're taking an appeal on, which we just feel it's unjust. We're a good government group, and I guess that's why people don't want to be in good government. We're trying to get the city back to where it should be, and we feel like we've just been kicked in the rear, and that's why we're here. I mean, I'm not being paid. I'm not a trademark lawyer like my learned counsel. I'm doing the best I can with this. Well, we appreciate both sides' arguments. We appreciate your time, and we appreciate good and better government. And the best government.